**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| RUSSELL CHRISTIE, | : |
| | :    Civil Action No. 12-988 (JLL) |
| Petitioner, | : |
| | : |
| v. | :    **OPINION** |
| | : |
| UNITED STATES OF AMERICA, | : |
| | : |
| Respondent. | : |
| | : |

**LINARES**, District Judge:

Presently before the Court is the motion of Russell Christie ("Petitioner") to vacate, set aside, or correct his sentence brought pursuant to 28 U.S.C. § 2255.  (ECF No. 1, 3, 5.) Respondent, United States of America ("Respondent"), filed a response (ECF No. 22), to which Petitioner replied (ECF No. 28).   For the following reasons, the Court denies the motion and no certificate of appealability shall issue.

## I.  BACKGROUND

On September 3, 2008, Petitioner was charged by way of an eight count second superseding indictment with possession, receipt, and advertising of child pornography in violation of 18 U.S.C. §§ 2251(d)(1)(A), 2252(a)(2)(A), and 2252A(a)(5)(B).   *See United States v. Christie*, 624 F.3d 558, 562 (2010).   Petitioner's indictment arose out of a two year investigation into a website belonging to the North American Man-Girl Love Association ("NAMGLA").   *Id.*   This website, which did not charge for use or admission, contained a password protected forum through which users exchanged sexually explicit images and videos of children.   *Id.*

The investigation into the website arose out of an FBI investigation into a federal fugitive named Jerrod Lochmiller on unrelated fraud charges. *Id.* Lochmiller, through his attorney, contacted authorities and offered an exchange:  if the fraud charges were dropped, he would provide the Government with access to the NAMGLA website and information which would aid in an investigation into the website's many users. *Id.* The investigation into the NAMGLA website was undertaken by Special Agent Douglas MacFarlane, who discovered that users of the website, in order to gain access to the password protected forums, were required to submit to the moderators of the site links to child pornography. *Id.* at 563. One of these moderators was an individual who used the screen name "franklee," an individual who MacFarlane found consistently posted new links to various child pornography images, videos, and websites on the forums. *Id.* Franklee was apparently one of the site's most prolific users, posting more than 2,500 individual posts to the website between October 2005 and July 2006. *Id.* As a moderator on the site, franklee not only frequently posted images, videos, and stories related to child pornography, but also "counseled less-experienced users about how to name and password-protect files to avoid detection by law enforcement authorities." *Id.*

After obtaining administrator level access to the NAMGLA website from Lochmiller, the FBI was able to track the IP addresses of the various users of the website back to particular individuals. *Id.* The FBI was then able to identify "franklee" as Petitioner through his IP address. *Id.* On July 25, 2006, the FBI searched Petitioner's home as part of a coordinated take-down of users of the NAMGLA site. *Id.* During the search of Petitioner's home, the FBI seized "over five-hundred CD-ROMs containing images of children engaged in sexually explicit conduct, printed images with similar content, and Christie's computer, the hard drive from which held over

250,000 graphic files, including 'several thousand' images of child pornography."[1]   *Id* at 563-64.

The FBI also seized "five composition notebooks containing notes reflecting the type of content on various child pornography websites as well as instructions on how to access them . . . [including] references to child pornography files that "franklee" had posted to the NAMGLA website, girls' names, child pornography search terms, websites used to upload child pornography, and Christie's notes on various pictures and websites."   *Id.* at 564.   The FBI additionally seized numerous children's toys.   *Id.*

Petitioner was thereafter arrested and interrogated by the FBI.   *Id.*   During the interrogation, Petitioner claimed that he owned the toys to quiet rowdy children on the school bus he drove, but admitted that he was the author of two particular posts on the NAMGLA website: one titled "nine-year-old in a supermarket" and the other about his becoming aroused while changing the diaper of a baby.   *Id.*   Following the interrogation, Petitioner was charged and ultimately indicted by way of the second superseding indictment on September 3, 2008.

Petitioner, through counsel, filed multiple pre-trial motions seeking the dismissal of multiple counts of the second superseding indictment as multiplicious and, in the alternative, the suppression of evidence on numerous grounds.   *See United States v. Christie*, 570 F. Supp. 2d

---

[1] Prior to the take-down searches, the FBI was able to determine that Petitioner "was employed as a school bus driver . . . [and] reside[d] at both 68 and 68A Philips Road."   *See United States v. Christie*, 570 F. Supp. 2d 657, 660 (D.N.J. 2008).   Based on observations, the FBI believed that 68 Philips Road was the address at which Petitioner resided, as the two were apparently indistinguishable from the outside.   *Id.* at 660-61.   While executing a search warrant for 68 Philips Road, the FBI realized that 68A, instead, was the attached apartment in which Petitioner lived.   *Id.*   The FBI immediately exited the 68 address and dispatched an agent to acquire a new warrant for the 68A unit, a process which took approximately seven hours during which FBI agents did not allow Petitioner or his mother to enter the home without an accompanying agent.   *Id.* at 661.

3

657, 659 (D.N.J. 2008).   As Petitioner was unhappy with the arguments raised by counsel, the trial court also permitted him to raise further arguments by way of supplemental motions and briefs, as well as supplemental argument before the court.[2]   *Id.*

The trial court issued its rulings on these motions by way of a published opinion.   *Id.* Dealing first with the arguments raised by counsel seeking to dismiss portions of the indictment, the trial court found that the counts of the indictment were not multiplicious as each referred to different posts, and that the indictment had provided sufficient notice of the offenses charged.   *Id.* at 662-66.   The trial court the also rejected counsel's argument that the seven hour seizure of Petitioner's home while agents were dispatched to acquire a second search warrant was not unreasonable under the circumstances, and that the evidence seized pursuant to the second warrant was thus admissible.   *Id.* at 666-69.   The trial court likewise rejected Petitioner's request for a *Franks* hearing as Petitioner had not alleged nor sufficiently supported a claim that the FBI had been recklessly or intentionally misleading in the affidavits underlying the search warrants used to search his home.   *Id.* at 670-673.   The trial court then turned to Petitioner's claims that the Government had engaged in outrageous conduct in its investigation of the NAMGLA site, and denied Petitioner's motion on that ground finding that the FBI's behavior fell well short of the exceedingly rare and exceptional cases in which outrageous conduct violated due process.   *Id.* at 673-675.   Finally, the trial court withheld judgment as to the admissibility of any statements made by Petitioner and dealt with several outstanding discovery issues.   *Id.* at 669-70; 675-76.

---

[2]  Although Petitioner originally hired private counsel, he was represented throughout the pre-trial motions and at trial by Lorraine Gauli-Rufio and John Yauch, both assistant federal public defenders who the trial court recognized as being "of the highest caliber."   *Id.* at 692.

4

The trial court then turned to Petitioner's *pro se* supplemental motions.   In his supplemental motions and argument, Petitioner argued that the search warrant contained stale information, that the warrant was overbroad and lacking in particularity, that the superseding indictment was overbroad and lacking in particularity, that certain images he posted to the NAMGLA site were insufficient to establish probable cause for the issuance of a search warrant, that the magistrate judge was required to view the alleged child pornography he had posted before issuing a warrant, that the FBI exceeded the scope of their search warrants, and that the facts alleged by the Government could not support a prosecution for advertisement of child pornography.[3]   *Id.* at 676-92.   The trial court rejected each of these claims in turn, finding them utterly unsupported by the case law cited.   *Id.*   The trial court found Petitioner's *pro se* supplemental claims so specious that the trial judge felt compelled to include the following admonition in his published opinion:

> Last, but not least, this Court, having thoroughly reviewed his independent brief and the arguments contained within, feels compelled to advise [Petitioner] that he would serve himself well if he were to allow his attorneys to utilize their expertise in defending him in this matter.   The Office of the Federal Public Defender has an excellent reputation in this District, and [defense counsel] are attorneys of the highest caliber within that Office.   This Court has had the privilege of having these attorneys appear before the Court on countless occasions, and they have always comported themselves in the most professional and admirable fashion, resulting in the sterling reputation they deserve.
>
> To the extent that they might have advised [Petitioner] not to make many of the arguments he has now made, the Court suggests that [Petitioner] reevaluate his reluctance to trust the counsel of these fine attorneys.   Indeed, nary a case cited by [Petitioner] in his independent motions supported the argument he tried to make.

---

[3] Petitioner also attempted to raise several factual disputes, but, as the trial court noted, those disputes were jury questions.   *Id.* at 689.

> Furthermore, some of the cases have since been overruled, and many of the quotations he found persuasive were in fact from dissents.   In sum, his attempt at self-representation has proven woeful.   Again, the Court implores [Petitioner] to acknowledge the expertise of his attorneys, given that they have been involved in innumerable criminal cases, and as a consequence have a wealth of experience that [Petitioner] would do well to rely upon going forward.

*Id.* at 692.

Trial in this matter commenced on November 12, 2008.   *Christie*, 624 F.3d at 564.   With the exception of two FBI agents who provided the foundation for his testimony, the Government first called Dr. Robert Johnson.   Dr. Johnson, who was qualified as an expert witness, provided his expert medical opinion that several pornography videos and photos, which were found on Petitioner's computer hard drive and on CD's located in Petitioner's home, were of young girls, all under the age of 18 and many under the age of 12.   (07-332 at ECF No. 88 at 38-66).

Following the doctor's testimony, the Government called FBI Special Agent Douglas Macfarlane.   (*Id.* at 69).   Agent Macfarlane provided the jury with the background information regarding Jerrod Lochmiller and the NAMGLA website summarized above.   (*Id.* at 71-105).   Macfarlane also provided background on the NAMGLA site, including explanations to the jury that it contained a section for posting nude images of children and another section for posting more "hardcore" forms of child pornography including images of children engaged in sex acts with other children and adults.   (*Id.*).   Macfarlane further testified that, in order to gain access to one of these galleries, individuals had to provide moderators with child pornography.   (*Id.*).

McFarlane then testified as to Petitioner's relationship with the NAMGLA site.   The agent testified that Petitioner, under the "franklee" user name, was one of the most prolific posters to the NAMGLA site, posting more than 2500 times.   (*Id.* at 105-106).   McFarlane also testified of

6

multiple separate instances in which Petitioner posted links to files containing child pornography to the NAMGLA website, including multiple sexually explicit videos of children both nude and engaged in sex acts with other children or adults, as well as many still images depicting young girls engaged in sexually explicit poses or acts.  (07-332 at ECF No. 96 at 4-43, 46-50).  The agent additionally testified as to forum posts wherein "franklee" had responded to the posting of child pornography by others, commenting on the images and videos indicating "franklee" had viewed them, and in some instances, corrected the posts by adding the correct link to connecting users to images and videos of child pornography.  (*Id.* at 55-65).  Agent Macfarlane also testified as to how the FBI obtained the IP address of "franklee" and traced that IP address back to Petitioner.  (*Id.* at 43-46, 51-54, 65-67).  Defense counsel then thoroughly cross-examined Macfarlane regarding his actions with Lochmiller and in tracing posts back to Petitioner.  (*Id.* at 69-134).

The Government then called FBI Agent Bernard Reidel.  (*Id.* at 135).  Reidel testified to several further instances where Petitioner, under the "franklee" guise, posted further images and videos of children either nude or engaged in sexually explicit activity to the NAMGLA website. (*Id.* at 141-151, 07-332 at ECF No. 95 at 2-7).  The Government called Agent William Weaver, who testified regarding his recovery of the NAMGLA hard drive.  (07-332 at ECF No. 95 at 14-20).  Keith Walls, an information technology specialist and forensic examiner with the FBI, then testified regarding his examination of the NAMGLA hard drive, which was then entered into evidence.  (*Id.* at 20-59).  The Government next called Supervisory Agent John Bennett, who testified regarding the search of Petitioner's home and statements made by petitioner following that search.  (*Id.* at 77).  Bennett first testified to the details of the search of Petitioner's home as

relayed above in relation to pre-trial motions before turning to statements made by Petitioner.   (*Id.* at 82-92).

As Bennett ultimately testified as to statements made by Petitioner to the FBI, the trial court held a hearing on Petitioner's statement between portions of the agent's testimony dealing with the search and those statements.   (*Id.* at 94).   During the hearing, the court heard testimony from both Agent Bennett and Petitioner as to the statements made by Petitioner, the *Miranda* warnings given to Petitioner, and Petitioner's demeanor and status, during which Petitioner claimed he was in a dream-like or dazed state.   (*Id.* at 94-167).   Following testimony, the court summarized the facts presented and made a finding that Agent Bennett's testimony was credible. (07-332 at ECF 97 at 1-14).   Turning to Petitioner, the court made the following credibility findings:

> [Petitioner] frequently contradicted himself during his account of the events.   [He] claims to have been in a "daze" or "dream" throughout his conversation with law enforcement . . . such that he didn't know what they were saying to him or what he was saying to them.   But now, more than two years after the fact, he recalls verbatim a handful of specific statements made by law enforcement officers that day, and only statements that were helpful to the defense.   Granted, [Petitioner] stated he wrote down his recollections the following day, but this explanation in my judgment does not convincingly explain how he remembered such specific details, given his alleged "dream" or "daze" state.   If he didn't know what was being said at the time, how could he remember the next day, let alone two years later.
> . . . .
> Coincidentally, all of the statements that [Petitioner] managed to remember involved threats by the officers or their statements of assumptions as of his guilt or [ways in which the FBI] was lying.
> . . . .
> To [the trial court], [Petitioner's] testimony appears to be little more than the creative, cunning, selective recollection of a person facing serious criminal charges.   For these reasons, I find that [Petitioner]'s testimony regarding the threatening remarks by

8

agents, the alleged lack of *Miranda* warnings, and the coercive presence of the agents to be an untruthful version of the events.

(*Id.* at 14-19).   Based on its finding that Petitioner was not credible and Agent Bennett was, the court concluded that Petitioner had not been in custody at the time of his conversation with the FBI while waiting for agents to return with the second warrant, and that in any event, Petitioner had been properly *Mirandized* twice orally and once in writing and had understood those warnings and voluntarily waived his rights.   (*Id.* at 19-21).   Finding no coercion by the agents, the Court therefore denied the motion to suppress the statements by Petitioner to Agent Bennett.   (*Id.* at 21-22).

Agent Bennett then testified before the jury as to his conversation with Petitioner.   Bennett testified that Petitioner told him he was employed by First Student Bus Company as a school bus driver.   (*Id.* at 28).   Petitioner also told Bennett that he would order and watch films of child pornography.   (*Id.*).   During his conversation with Bennett, Petitioner admitted that he was a user of the NAMGLA website, and specifically admitted to authoring two stories posted to the website: one involving a nine-year-old in a grocery store, and the other Petitioner's becoming sexually aroused while changing a baby's diaper, both of which were posted by "franklee."   (*Id.* at 30, 33). Petitioner told the agent that he had posted those stories, and that they were both fantasies of his. (*Id.* at 32).   Petitioner also admitted to using the "franklee" user name, which was based on the name of a former employer of Petitioner's with whom Petitioner was not happy.   (*Id.* at 32-33).

Following this testimony, the Government called Investigator Gillmurray of the Middlesex County Prosecutor's Office, who testified as to his seizure of Petitioner's hard drive he made during the search of Petitioner's home. (*Id.* at 85-88).   Gillmurray also testified that he found images of nude children on the hard drive.   (*Id.* at 95).   Upon finding those images, Gillmurray

9

testified that the hard drive was turned over to the FBI.   (*Id.*).   The Government then called Special Agent Frigm, who testified regarding materials seized from Petitioner's home.   The Agent testified that he specifically recovered several notebooks containing what the trial court described as a "cornucopia" of references to child pornography and child pornography websites, over three hundred CDs, Petitioner's computer, and several printed photographs.   (*Id.* at 103-117).

The government thereafter called Benedetto Demonte, a forensic examiner employed by the FBI in its New Jersey Regional Computer Forensic Laboratory, where he is the assistant laboratory director.   (07-332 at ECF No. 89 at 15-17).   Demonte testified regarding his examination of the computer and hard drive seized from the home of Petitioner.   (*Id.* at 20-22). Demonte testified that Petitioner's computer had contained over 250,000 images, including many thousand which had been deleted but were still recoverable on the computer's hard drive.   (*Id.* at 23-25).   Demonte also testified that Petitioner's browser history included visits to the NAMGLA website by Petitioner.[4]   (*Id.* at 28-29).   The government also called another examiner from that office, Raymond Salapka, who testified regarding his copying of certain CDs seized from Petitioner's home which were then entered into evidence.   (*Id.* at 43-47).

Special Agent Jacqueline Cristiano then testified.   (*Id.* at 49).   Cristiano first testified regarding a background check on Petitioner, as well as about the search of Petitioner's residence. (*Id.* at 50-57).   Cristiano also testified regarding the forensic examination of Petitioner's hard drive, and how the images on his hard drive and CDs were delivered to the FBI.   (*Id.* at 48-66). Cristiano then testified regarding several images and videos of child pornography recovered from

---

[4]  A CD containing many, but not all, of the images and Petitioner's internet history was entered into evidence as a result.   (*Id.* at 28-32).

Petitioner's computer and CDs, including many which matched those posted by "franklee," as well as the text of posts Petitioner had made to the NAMGLA website.[5]   (*Id.* at 67-78, 80-81, 85-87, 90-92, 93-95, 95-97, 98-101, 110-12, 114-16, 117-19, 130-36).   Cristiano also testified regarding Petitioner's journals, which contained references to these images and videos which matched information "franklee" had posted on the NAMGLA site telling other individuals how to access the sexually explicit images and videos of children "franklee" had provided through links to file sharing sites.   (*Id.* at 81-85, 88-89, 92, 95-96, 102-105, 110-11, 111-14, 116-17, 119-22).   Cristiano also testified that Petitioner's handwritten notebooks contained numerous references to other individuals who had posted on the NAMGLA website.   (*Id.* at 122-23).   Cristiano further explained that Petitioner's journals contained information regarding search terms used to find child pornography, as well as listings of child pornography websites Petitioner had viewed and notes on the images he had found there, including references to the ages of the depicted minors and ratings as to Petitioner's enjoyment of the images.   (*Id.* at 124-29).   Agent Cristiano also testified that in total, 220 videos and "several thousand images" were found on Petitioner's hard drive, some of which were the images and videos on which Dr. Johnson had previously testified as to the age of the children depicted.[6]   (*Id.* at 139-145).   Cristiano next testified as to Petitioner's internet history, which established Petitioner's repeated visits to the file sharing websites he and others

---

[5] The images which Petitioner possessed on his computer and CDs which matched those posted by "franklee" to the NAMGLA website include both images of nude children posed in a sexually explicit manner as well as pictures and/or videos depicting children engaged in sex acts with adults, including one video Petitioner posted to the NAMGLA site of "a minor female performing oral sex on an adult male."   (07-332 at ECF No. 89 at 96).

[6] On cross examination, Cristiano agreed with counsel that there was a "virtual treasure trove of child pornography" found in Petitioner's home, which was one of the largest collections of such material Cristiano had seen while working for the FBI.   (*Id.* at 161).

used to post child pornography.  (*Id.* at 146-54).  Finally, Cristiano testified about certain posts Petitioner, as "franklee" made to the NAMGLA website explaining to other users how and where to post and name child pornography files to better avoid detection and prosecution, as well as a post in which Petitioner specifically instructed another user that the NAMGLA rules required all girls posted to be under sixteen years of age.  (*Id.* at 155-57).

Following a *Daubert* hearing on her qualifications and the cross examination of Mr. Demonte,[7] the Government called Dr. Nicole Spaun as an expert witness.  (07-332 at ECF No. 98 at 67).  Dr. Spaun, who works in the FBI's Digital Evidence Laboratory, testified that she had conducted an examination of the images and videos taken from Petitioner's computer and CDs. (*Id.* at 68-77).  Dr. Spaun testified that she had examined 24 images and eight videos taken from Petitioner's collection, and had determined that they were not computer generated, but actual pictures and videos of real children which had not been digitally created or manipulated.  (*Id.* at 76-84).  Dr. Spaun also more specifically testified that the images and videos which were the basis of Petitioner's advertising charges (those posted to the NAMGLA site by "franklee") were actual depictions of real children engaged (where applicable) in real sex acts.  (*Id.* at 84-91).

After Dr. Spaun concluded her testimony, the Government called Thomas Connor, a detective employed by the Parma Police in Ohio.  (*Id.* at 92-94).  Connor testified regarding his involvement in the arrest of James Hornack, a man who had produced 153 images of himself engaged in sex acts with his minor daughter.  (*Id.* at 95-97).  Connor was then asked to identify

---

[7] Which was delayed to give the defense a chance to prepare as Demonte had replaced another forensic examiner.  (07-332 at ECF No. 98 at 52-67).  After that examiner was replaced, Demonte had replaced her and redone all of the examination work himself, and his testimony was based on his own personal work and knowledge, not on that of the prior examiner.  (*Id.*).

some of the images seized from Petitioner's collection, which he stated were some of the 153 pictures Hornack had taken of his daughter.   (*Id.* at 97-98).   Connor also testified that, at the time the pictures were taken, Hornack's daughter had been between eight and ten years of age.   (*Id.* at 99).   Connor then testified that Hornack had transmitted the 153 pictures onto the internet, where they had been downloaded by multiple persons in several states.   (*Id.* at 101-02).

Following Connor's testimony, the Government rested its case.   Petitioner, through counsel, then made a Rule 29 motion to dismiss for insufficient proof as to all elements of the charged offense, which the trial court denied.   (*Id.* at 104).   After the rule 29 motion, Petitioner elected, after discussion with counsel and an opportunity to discuss the matter with a jail psychiatrist by whom he had been treated, not to testify on his own behalf, a fact which the trial court confirmed by way of a colloquy in which Petitioner confirmed that he had discussed the matter with counsel and that he had chosen not to testify on his own behalf.   (*Id.* at 110-11).

The defense called only a single witness, Assistant U.S. Attorney Wesley Hsu working out of the Los Angeles United States Attorney's office.   (07-332 at ECF No. 90 at 4-5).   The defense questioned Hsu about Jerrod Lochmiller and the charges which had been arrayed against Lochmiller, which involved the sale of forged identification, which had ultimately led to the exposure of the NAMGLA website in exchange for the dismissal of the mail fraud charge against Lochmiller.   (*Id.* at 6-34).   Hsu testified that the government had, at times, had difficulty controlling Lochmiller, who hadn't signed the offered agreements with the government, and that it was Lochmiller, of his own accord, who had moved the server of the NAMGLA site to Houston (where its hard drive was seized by the FBI) from Malaysia.   (*Id.*).   On cross-examination, Hsu confirmed that the information provided by Lochmiller had proven reliable and had led to the arrest

13

of approximately thirty individuals on child pornography related charges, including Petitioner.

(*Id.* at 35-45).

The jury was charged on November 24, 2008.   (07-332 at ECF No. 92 at 60-101).   As to

the six counts charging advertisement of or attempt to advertise child pornography, the trial court

provided the following as to the elements of the charge

> One, first, that on or about each of the dates charged in the indictment, [Petitioner] knowingly made, printed, or published, or caused to be made, printed, or published, a notice or advertisement that sought or offered to receive, exchange, buy, produce, display, distribute, or reproduce a visual depiction; second, that the visual depiction showed a minor engaging in sexually explicit conduct; third, that the depiction was made using a real person, that is, a real minor; and fourth, that [Petitioner] knew or had reason to know the notice or advertisement would be transported in interstate or foreign commerce by any means, including by computer
>
> . . . .
>
> You may find that a nondescriptive website link that leads to a video or image of child pornography, without more, is a notice or advertisement under the statute.

(*Id.* at 77-79).   The court also informed the jury that a visual depiction included film or video, that

a minor meant any real person under eighteen years of age, and that sexually explicit conduct

included actual or simulated graphic sexual intercourse of any type or the lascivious display of the

genitals or pubic area of the minor.   (*Id.* at 80).   As to lasciviousness, the Court instructed the

jury to consider the appropriate factors including whether the focal point was the child's genitals

or pubic area, whether the setting was sexually suggestive, whether the child is in an unnatural

pose or inappropriate desire, whether the child is partially or entirely nude, whether the depiction

suggest sexual coyness or willingness to engage in sexual activity, and whether the depiction is

intended to elicit a sexual response from the viewer; and that the jury needed to find more than

one, but not all of the factors to find lasciviousness.   (*Id.* at 80-81).   The jury was also instructed as to attempt and that to find Petitioner had attempted to advertise child pornography, he must have intended to make a notice or advertisement as previously defined and performed a substantial step toward committing the crime of advertisement.   (*Id.* at 82-83).

As to count seven, receipt of child pornography, the jury was instructed that the Government had to prove that Petitioner knowingly received child pornography, that the pornography had been transported through interstate commerce (including via computer), and that at the time he received it, Petitioner believed that he had received materials containing child pornography.   (*Id.*at 84-85). The Court also repeated the definitions of interstate commerce, child pornography, and the elements of an attempt to commit the crime of receipt of child pornography. (*Id.* at 85-87).   As to the final count, possession of child pornography, the court instructed the jury that the Government had to prove that Petitioner knowingly possessed a computer hard disk that contained child pornography, which had been shipped through interstate or foreign commerce through any means including by computer, and that Petitioner believed the items contained child pornography at the time of possession.   (*Id.* at 88-89).   The jury was also instructed at length regarding the scienter requirement that Petitioner "knowingly" possessed, received, and advertised child pornography.   (*Id.* at 92).

Charging was completed, and the jury began its deliberations at approximately 1:41 p.m. (*Id.* at 101).   At approximately 4 p.m., the jury returned with a verdict of guilty on all counts.   (*Id.* at 102-05).   After the verdict, Petitioner made both a motion for acquittal and a motion to dismiss the indictment on outrageous conduct grounds.   (07-332 at ECF No. 87).   The trial court denied those motions on March 17, 2009, by way of formal opinion, finding that Petitioner had not

15

demonstrated outrageous conduct and finding no basis to disturb the jury's verdict.   (07-332 at ECF No. 105).

The trial court sentenced Petitioner on June 23, 2009.   (07-332 at ECF No. 116, 123, 124). Over the objection of Petitioner, the Government called a single witness during the sentencing, a young woman who testified that she had been sexually abused by Petitioner over a number of years prior to the actions for which Petitioner was convicted.   (07-332 at ECF No. 124 at 15-17).   This witness, referred to as Victim One, was called for the purpose of establishing that Petitioner's actions reflected a continuing pattern of sexual abuse under U.S.S.G. § 2G2.2(b)(5) and *United States v. Olfano*, 503 F.3d 240, 243-44 (3d Cir. 2007).   (07-332 at ECF No. 124 at 15-17).

Victim One testified that she, with her family, had visited Petitioner's camp ground when she was nine years old.   (*Id.* at 22-23).   According to Victim One, Petitioner took a special interest in her and invited her and her brother to his house to play video games.   (*Id.*).   During these visits, however, Petitioner would brush up against and grope her while her brother played the games.   (*Id.* at 23).   Over time, Petitioner became a family friend and would often babysit Victim One and her brother.   (*Id.* at 24).   Eventually, Petitioner's groping turned into more overt sexual activity, and, according to Victim One's testimony, Petitioner entered into a sexual relationship with her when she was between ten and twelve which continued until Victim One turned nineteen.   (*Id.* at 24-25).   During that period, Petitioner used drugs and alcohol to coerce Victim One into continuing to engage in intercourse with him, as well as threatening her family were she to expose their relationship.   (*Id.* at 25-40).   Petitioner also apparently forced her to sign documents, while she was a minor, which purportedly expressed her consent to have sex with him which were dated for after her eighteenth birthday.   (*Id.* at 32-34).   Petitioner also took sexually

16

explicit photographs of victim one throughout the period of abuse.   (*Id.* at 35-36).   Victim One

also testified that Petitioner had showed her child pornography on multiple occasions.   (*Id.* at 38-

39).   On cross-examination, Victim One admitted that she had a criminal record, including drug

charges and a conviction for theft by deception, as well as an extensive history of drug use which

Victim One attributed to Petitioner's attempts to addict her to heroin and other drugs.   (*Id.* at 42-

49).   Following this testimony, the trial court found Victim One to be credible, and as such, a five

level enhancement applied to Petitioner's sentence under the guidelines.   (*Id.* at 62-74).

Applying this enhancement to the guidelines calculation computed by the Probation Office, the

court therefore concluded that Petitioner's offense level was 45, which, given his criminal history

category of I, would merit a life sentence under the guidelines.   (*Id.* at 77).

 Following argument by counsel as to the sentencing factors under 18 U.S.C. § 3553(a), the

Court sentenced Petitioner.   (07-332 at ECF no. 123 at 11).   After discussing the advisory nature

of the sentencing guidelines, the Court turned to the sentencing factors and found that Petitioner's

offense was "of the most severe magnitude"; that defendant's history and characteristics showed

that he was no mere child pornography viewer, but had a history of sexually abusing children as

well; that Petitioner had shown little respect for the law; and that a sentence which adequately

deterred Petitioner and others from engaging in such activity in the future was necessary.   (*Id.* at

19).   As to Petitioner himself, the court made the following findings:

> In addition, I've already assessed defendant to be a dishonest
> individual on the basis of his sworn testimony out of the presence of
> the jury at the . . . suppression hearing.   Defendant's contradictory
> statements, as well as his selective memory, despite having been in
> a medication induced haze, of what he considered to be outrageous
> law enforcement conduct, convinced this Court that [Petitioner] was
> an outright liar.   Indeed, in ruling from the bench on the motions to
> suppress . . . this Court described [Petitioner's] testimony as little

17

> more than the creative, cunning, selective recollection of a person facing serious criminal charges.
>
> [Petitioner] has also refused to cooperate with the probation office since his conviction, specifically, refusing to meet with probation officials in the preparation of his PSR. He has evinced no remorse. If anything, I've gotten the impression that there is an aura of braggadocio with regard to how [Petitioner] feels about his conduct. I don't think there is a bone in [Petitioner's] body that feels sorrow or even sympathizes for the victims of his crimes. Having listened to [him] speak, this Court has been left with the impression that he considers these children as mere instruments for his pleasure, mere objects of desire. The way [Petitioner] has conducted himself in and out of the courtroom bespeaks utter disregard for decency and respect and for the rule of law. Although this Court cannot be sure that a sentence today will register one way or the other with [Petitioner], I am certain that [the] sentence will promote respect for the law by others in light of his offenses.

(*Id.* at 17-18).

After rejecting Petitioner's argument that the sentencing guidelines were too harsh in this case given Petitioner's conduct, the Court sentenced Petitioner as follows:

> Pursuant to the Sentencing Reform Act of 1984, the advisory suggestions of the United States [Sentencing] Guidelines, and in exercise of this Court's discretion, in light of all the relevant considerations and circumstances in this case, it is the judgment of this Court that [Petitioner] is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 180 months on each of Counts 1 through 6, to be served consecutively, and a term of 60 months on Count 7, to be served concurrently to Counts 1 through 6, and a term of 60 months on Count 8, also to be served concurrently to Counts 1 through 7.
>
> Upon release from imprisonment, defendant shall be placed on supervised release for a term of life. This term consists of life terms on each of Counts 1 through 8, all such terms to run concurrently.

(*Id.* at 32). The court also imposed the relevant fines and restrictions. (*Id.* at 30-37).

Following sentencing, Petitioner filed a direct appeal with the Court of Appeals for the

18

Third Circuit.   In his appeal, Petitioner challenged the admission of a statement by the lead FBI agent that other individuals had been arrested and admitted guilt in the same nationwide takedown that had resulted in Petitioner's arrest, the titles of two posts Petitioner made to the NAMGLA website, testimony regarding toys seized from Petitioner's home, and the five composition notebooks containing Petitioner's notes on various child pornography websites.  *Id.* at 567. Petitioner also challenged the trial court's question to the lead FBI agent in which the trial court asked whether the NAMGLA users posted websites, images and videos for "kicks" rather than for pecuniary gain; the FBI's handling of Jerrod Lochmiller under federal Criminal Informant Guidelines; the trial court's ruling that Petitioner lacked an expectation of privacy in his computer's IP address, and the reasonableness of his sentence.  *Id.* at 572-75.   Petitioner also argued that the cumulative effect of the trial court's errors resulted in an unfair trial.  *Id.* at 572.

The Third Circuit rejected all of Petitioner's claims but one:   Petitioner's claim that the trial court erred by admitting testimony regarding the toys seized from Petitioner's home.   The Third Circuit held that this testimony was unduly prejudicial in so much as the toy testimony lacked nearly any probative value.[8]  *Id.* at 570-71.   In spite of the unduly prejudicial nature of the toy testimony, which the Third Circuit suggested prejudiced Petitioner by suggesting that he possessed the toys so that he could use them to lure the children from the bus he drove to his home so that he could molest them, the appellate court still found the error to be ultimately harmless because of the staggering quantity of evidence produced at trial.  *Id.* at 571.   Specifically, the Third Circuit

---

[8]  The information regarding the toys was admitted because the Government argued that Petitioner's truthful statement regarding the toys in relation to his employment as a bus driver suggested that he was also truthful in admitting to his posts on the NAMGLA website.  *Christie*, 624 F.3d at 570-71.   The Third Circuit found that particular argument served "as its own refutation."  *Id.*

found that

> [a]s unduly prejudicial as [the toy related] evidence may have been
> in this context, we nevertheless conclude that the error was harmless
> given the truly overwhelming quantity of evidence against
> [Petitioner], including his admissions to [FBI agents], his moderator
> status and activities on the NAMGLA website, his handwritten
> notebooks documenting the various child-pornography related
> websites, and the thousands and thousands of images of child
> pornography in his possession.   [Petitioner] himself acknowledges
> that "[t]he government had . . . an extraordinary amount of relevant,
> admissible, and indisputably disturbing evidence, which it displayed
> and described multiple times."

*Id.* at 571 (internal citations omitted).

As to Petitioner's sentence, the trial court rejected Petitioner's argument that the

Sentencing Guideline dealing with child pornography, U.S.S.G. § 2G2.2, produced inherently

flawed, unnecessarily severe sentences in even "the most routine cases."   *Id.* at 574.   The Third

Circuit held that

> [w]hether or not § 2G2.2 may produce unreasonable sentences in
> some cases – a subject on which we make no comment here – the
> sentence in this case is not unreasonable.   First, [Petitioner's]
> collection of many thousands of images of child pornography
> powerfully indicates that this is not the routine case.   Second, and
> more importantly, [Petitioner] helped to run a network that allowed
> for the trading of hundreds of thousands of unlawful images.   As a
> moderator of the NAMGLA site, he facilitated the trading and
> possession of child pornography by other users, showing that he is
> guilty of far more than mere possession.   Third, the District court
> noted that [Petitioner] expressed no remorse and believed that he
> was likely to reoffend in the future.   All of those facts support the
> reasonableness of the District Court's sentence, based on
> [Petitioner's] particular history and characteristics and the specific
> characteristics of his offense.   Accordingly, on the facts of this
> case, we are satisfied that the [1,080 month] sentence was within the
> bounds of reasonableness.

*Id.* at 574-75.

Following his appeal, Petitioner filed a petition for certiorari to the United States Supreme Court as to the question of whether he possessed an expectation of privacy in his IP address. The Supreme Court denied that petition on February 22, 2011. *See Christie v. United States*, 131 S. Ct. 1513 (2011). Petitioner filed his motion to vacate his sentence on February 17, 2012. (ECF No. 1). In his motion Petitioner raises well over one hundred claims and effectively seeks to relitigate nearly every aspect of his original trial.

## II.  DISCUSSION

### A.  Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.

"Section 2255 is not a tool with which a frustrated defendant can force the Court's attention to any and every aspect of her case." *See Berkovits v. United States*, No. 98-585, 1998 WL 289691, at *4 (S.D.N.Y. June 4, 1998) (citing *United States v. Addonizio*, 442 U.S. 178, 185 (1979)). Unless the moving party claims a jurisdictional defect or a Constitutional violation, the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, (or) an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir.)

(quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

**B.   Analysis**

**1.   An evidentiary hearing is not required**

The habeas statute requires an evidentiary hearing "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. §2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992).   Where the record, as supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by a petitioner or indicate that petitioner is not entitled to relief as a matter of law, no hearing is required.  *Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546 (evidentiary hearing only necessary where the petitioner's claims are not conclusively resolved by the record).   For the reasons explained below, Petitioner's claims are either procedurally barred or without merit, and therefore the record establishes that Petitioner is not entitled to relief as a matter of law.   As such, an evidentiary hearing is not required.

**2.   Petitioner may not relitigate those matters decided on direct appeal[9]**

Among the over one hundred claims Petitioner raises in his § 2255 motions are several

---

[9] Petitioner raises these issues, in whole or in part, in his grounds 55, 61, 67, 79, 86, 94, 105, and 113.

claims challenging the admissibility of toys, notebooks, and forum post titles admitted at trial, as well as claims challenging the district and circuit courts' rulings on the reasonableness of Petitioner's sentence, Petitioner's claim that he had an expectation of privacy in his IP address, and on Petitioner's claim that the Government engaged in outrageous conduct.   These claims were all raised and decided on direct appeal.   All but the toy issue were decided adversely to Petitioner on direct appeal, and even the admission of the toys was held to be harmless error by the Court of Appeals.   *See Christie*, 624 F.3d at 567-75.   A § 2255 motion "is not a substitute for an appeal" and therefore cannot "be used to relitigate matters decided adversely on appeal."   *Nicholas*, 759 F.2d at 1075.   As such, § 2255 "may not be employed to relitigate questions which were raised and considered on direct appeal."   *United States v. DeRewal*, 10 F.3d 100, 105 n. 4 (3d Cir. 1993) (internal quotations omitted); *see also United States v Travillion*, 759 F.3d 281, 288 (3d Cir. 2014) ("issues resolved in a prior direct appeal will not be reviewed again by way of § 2255 motion"). As Petitioner's claims regarding the toys, notebooks, forum post titles, his sentence, the lack of an expectation of privacy in one's IP address, and as to the Government's allegedly outrageous behavior have all been previously decided by the Third Circuit on direct appeal, he may not raise those issues here, and those specific claims must therefore be denied.

## 3.   Petitioner's Fourth Amendment Claims Are Barred[10]

Petitioner raises numerous claims arising out of alleged violations of his Fourth Amendment rights to be free from unreasonable searches and seizures.   In *Stone v. Powell*, 428

---

[10]  Petitioner makes Fourth Amendment claims throughout his petition, including in grounds 1, 6,-12, 15, 16, 20, 25, 62, and 67.

U.S. 465 (1976), the Supreme Court held that Fourth Amendment claims were not cognizable in habeas petitions brought under 28 U.S.C. § 2254 where a petitioner had been accorded a full and fair opportunity to litigate the issues in the trial courts.  *Id.* at 494.  While the Court has not explicitly applied the holding of *Stone* to motions brought pursuant to § 2255, the Court has long treated petitions under §§ 2254 and 2255 as equivalent to one another and has suggested that *Stone*'s holding is applicable to § 2255 motions.  *See, e.g., Davis v. United States*, 417 U.S. 333, 344 (1974); *United States v. Johnson*, 457 U.S. 537, 562 n. 20 (1982) ("[a]fter [*Stone*] the only cases raising Fourth Amendment challenges on collateral attack are those federal habeas corpus cases in which the State has failed to provide an opportunity for full and fair litigation claim [and] analogous cases under [§ 2255]").   Numerous circuit and district courts, including several district courts in this circuit, have therefore held that *Stone*'s holding does apply to § 2255 motions, and that a petitioner may not relitigate Fourth Amendment claims where he has had a full and fair opportunity to litigate those issues in the federal trial court.  *See Ray v. United States*, 721 F.3d 758, 761-62 (6th Cir. 2013); *Brock v. United States*, 573 F.3d 497, 500 (7th Cir. 2009); *United States v. Ishmael*, 343 F.3d 741, 742 (5th Cir. 2003); *United States v. Cook*, 997 F.2d 1312, 1317 (10th Cir. 1993); *United States v. Hearst*, 638 F.2d 1190, 1196 (9th Cir. 1980); *Huggins v. United States*, --- F. Supp. 2d ---, ---, 2014 WL 4828979, at *21 (D. Del. 2014); *United States v. Brown*, No. 04-4121, 2005 WL 1532538, at *5, *5 n. 14 (E.D. Pa. June 28, 2005); *see also United States v. Thomas*, 713 F.3d 165, 173 (3d Cir. 2013) (citing *Cook* with approval, albeit on a different issue).   This Court concludes, as did numerous other federal courts, that the holding of *Stone* does apply to motions brought pursuant to § 2255, and as a result, Petitioner may not raise Fourth Amendment claims so long as he was given a full and fair opportunity to litigate Fourth

Amendment issues in the trial court.

The record here makes it abundantly clear that Petitioner received a full and fair opportunity to litigate his Fourth Amendment claims in the trial court.   Not only were Petitioner's lawyers afforded the opportunity to make numerous pre-trial motions challenging the admissibility of evidence, including that seized as a result of the search of Petitioner's home, but the trial court even permitted Petitioner to make several additional arguments *pro se* as to the admissibility of the evidence and the legality of the search.   As the trial court's published opinion makes it abundantly clear that the trial judge fully considered all of Petitioner's arguments and resolved them fairly, this Court finds that Petitioner received a full and fair opportunity to litigate any and all Fourth Amendment issues in the trial court.   Petitioner's claims raising Fourth Amendment claims here are therefore not cognizable here.   *See Ray*, 721 F.3d at 761-62; *Brock*, 573 F.3d at 500; *Ishmael*, 343 F.3d at 742; *Cook*, 997 F.2d at 1317; *Hearst*, 638 F.2d at 1196.

### 4.  Ineffective Assistance of Counsel[11]

Petitioner argues that his trial counsel was ineffective for various reasons.   Claims of ineffective assistance of counsel which arise under the Sixth Amendment are governed by the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*, a petitioner must first show that "counsel's performance was deficient.   This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment."   *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).   Second, a petitioner must show that counsel's deficient performance prejudiced his

---

[11] Petitioner's ineffective assistance claims are, in whole or in part, contained in Petitioner's grounds 27, 29, 31, 48, 59, 72, 83, 88, 89-104, 107, 109, and 111.

defense such that counsel's errors were so serious as to "deprive [the petitioner] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In determining whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). Petitioner must therefore show that his counsel's representation "fell below an objective standard of reasonableness" considering all the circumstances. *Id.* Reasonableness in this context is determined based on the facts of the particular case, viewed as of the time of conduct alleged to have been ineffective. *Id.* Judicial scrutiny of counsel's performance "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Even if Petitioner shows that counsel was deficient, he must still affirmatively demonstrate that counsel's deficiency prejudiced his defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Petitioner must show that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," it is often appropriate for the Court to first address and dispose of a petitioner's ineffective assistance claims through the prejudice prong. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

Here, although he raises many claims of ineffective assistance of counsel, Petitioner fails

26

to show that he was prejudiced by any of the alleged deficiencies of counsel.   With the exception of a few specific claims which are discussed below, Petitioner either does not address the prejudice prong, addresses it only through bald assertions without further argument or support, or simply concludes that counsel had "nothing to lose" by taking the actions Petitioner suggests would have been more appropriate or that the outcome "may well" have been different.   (*See, e.g.,* ECF No. 1 at PageID 155).   Such assertions are patently insufficient to establish *Strickland* prejudice.   *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010).   Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," the petition is insufficient to warrant even an evidentiary hearing, let alone habeas relief.   *Id.*   Petitioner has thus failed to show *Strickland* prejudice, and thus his claims of ineffective assistance of counsel must fail.

Even had Petitioner attempted to show prejudice, however, it is doubtful he could have succeeded.   "It is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied."   *Saranchak v. Beard*, 616 F.3d 292, 311 (3d Cir. 2010) (quoting *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999)).   Where the evidence of a Petitioner's guilt was established by overwhelming evidence, a Petitioner usually cannot show that he was prejudiced by counsel's mistakes unless he can provide "a considerable amount of new, strong evidence to undermine" his conviction.   *Id.*; *see also Copenhafer v. Horn*, 696 F.3d 377, 390 (3d Cir. 2012) ("[i]n light of the overwhelming evidence . . . we agree . . . that [the petitioner] cannot show he was prejudiced").

Here, on direct appeal, the Third Circuit characterized the evidence presented against Petitioner as including "a truly overwhelming quantity of legitimate evidence . . . including his

27

admissions to [the FBI], his moderator status and activities on the NAMGLA site, his handwritten notebooks documenting and rating various child-pornography related websites, and the thousands and thousands of images of child pornography in his possession." *Christie*, 624 F.3d at 571. Indeed, in his appeal, Petitioner "acknowledge[d] that '[t]he government had . . . an extraordinary amount of relevant, admissible, and indisputably disturbing evidence.'" *Id.* The evidence presented at trial was so overwhelming that the Third Circuit held that even the highly prejudicial toy evidence which suggested Petitioner was not only an advertiser of child pornography, but also a sexual predator using his bus driver job to further his aims, was ultimately harmless. *Id.* at 572. Given the sheer quantity and nature of the evidence presented against Petitioner at trial, it is doubtful that Petitioner could show prejudice even had he attempted to do more than he has here.[12] Although the Court is satisfied that Petitioner has generally failed to show that he was prejudiced, the Court now turns to those few ineffective assistance claims where Petitioner made some attempt to show that he suffered prejudice.

### a. Petitioner's argument that counsel was ineffective for failing to seek transfer of Petitioner's case because of local prejudice against him

Petitioner argues, both substantively and as the basis for a claim of ineffective assistance of counsel, that his criminal trial should have been transferred out of the Newark vicinage as he had driven the school bus for the children of several prominent individuals including business

---

[12] This is especially true given the trial court's findings as to the high quality of the legal services and advice provided to Petitioner by the Federal Public Defenders. *See Christie*, 570 F. Supp. 2d at 692.

owners and state court judges.   Changes of venue within a given district are governed by Rule 18 of the federal rules of criminal procedure.   *See United States v. Jacobs*, 311 F. App'x 535, 538 (3d Cir. 2008).   Under the rule, the court "must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice."  Fed. R. Crim. P. 18.   In order to warrant transfer on the basis of claimed prejudice, a criminal defendant must establish the existence of the claimed prejudice, and the mere suggestion that prejudice exists is insufficient.   *Jacobs*, 311 F. App'x at 538.

Petitioner suggests that his right to a fair trial was impugned because he had driven a bus on which the children of a state court judge and several local businessmen (with names similar to those of members of the US Attorney's Office) and thus his name, and likeness was well known. While Petitioner was employed as a bus driver, he was employed in only one small segment of the Newark vicinage.    The Newark vicinage is quite large, covering approximately one third of the State of New Jersey and containing several million people.   There is nothing in the record to suggest that any knowledge of Petitioner by the people in the small segment of the vicinage in which he worked somehow equates to pervasive local prejudice, or, for that matter, any prejudice whatsoever.   Likewise, there is no basis to believe that the alleged important people who "knew" Petitioner had any connection with anyone involved in Petitioner's trial or jury.   Given the large number of people within the geographical confines of the Newark vicinage, the lack of any apparent connection between the "important" people and Petitioner's trial, and as Petitioner has not shown that there was any pervasive prejudice or even the appearance of such prejudice, had counsel raised a motion for a change of venue, that motion would have been denied.  *Id.*; *see also United States v. Inigo*, 925 F.2d 641, 654 (3d Cir. 1991) (in the context of a motion to transfer

29

districts under Rule 21).   As any motion to transfer venue would have been denied, Petitioner

suffered no prejudice from counsel's failure to raise the issue, and has therefore not shown that

counsel was constitutionally ineffective.

    b.  **Petitioner's claim that Counsel was ineffective for failing to make a speedy trial motion**

Petitioner also argues that counsel could have, but did not, seek dismissal of the indictment

pursuant to the Speedy Trial Act, and that had counsel made such a motion, his indictment would

have been dismissed.   To establish *Strickland* prejudice on a claim that counsel failed to make a

speedy trial motion, it is not enough to show that the indictment would have been dismissed,

Petitioner is instead required to show that, more likely than not, the motion would have resulted in

a dismissal *with prejudice*.   *See United States v. Zahir*, 404 F. App'x 585, 588 (3d Cir. 2010).

Under the Speedy Trial Act, the decision of whether to dismiss with or without prejudice must be

decided based on the seriousness of the offense, the facts and circumstances of the case which led

to the dismissal, and the impact of a re-prosecution on the administration of justice.   *See* 18 U.S.C.

§ 3162(a)(1).   Where a Petitioner has not addressed these factors, he cannot demonstrate that the

indictment would have been dismissed with prejudice, and therefore fails to demonstrate

*Strickland* prejudice.   *Zahir*, 404 F. App'x at 588.


Here, Petitioner has failed to show that the indictment would have been dismissed with

prejudice.   He does not attempt to address the factors under the Act.   As he argues substantively

that he was entitled to a speedy trial dismissal either statutorily or constitutionally, the Court will

address that issue as well.   Under the Act, trial "shall commence within seventy days from the

filing date . . . of the . . . indictment or from the date the defendant has appeared before a judicial

officer of the court in which the charge is pending, whichever date last occurs."   18 U.S.C. §3161(c)(1).   Excludable from the seventy days, however, are delays resulting from any pretrial motion, from the filing of the motion through the hearing on or disposition of the motion, and any period of delay "resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."   18 U.S.C. §3161(h)(1)(f), (h)(8)(A).[13]

In this case, Petitioner was initially indicted on April 20, 2007.   He was not arraigned and his speedy trial clock did not begin, however, until May 22, 2007.   *See United States v. Willaman*, 437 F.3d 354, 357 (3d Cir.) (even where bail hearings prior to indictment occurred, the entry of a not guilty plea at arraignment triggers the speedy trial time period), *cert. denied*, 547 U.S. 1208 (2006).   (No. 07-332 at ECF no. 20, 22).   On April 30, 2007, the first post-indictment continuance was entered, excluding all time between April 30 and May 30, 2007.[14]   (No. 07-332 at ECF No. 21).   Nineteen days passed between May 30, when the clock began to run again, and June 18, 2007.   On June 7, 2007, the trial court entered a second continuance, requested by Petitioner based on the complexity of his case, excluding the dates between June 18, 2007 and

---

[13] This citation refers to the version of §3161 in effect at the time of Petitioner's trial.   The statute was amended effective October 13, 2008, after the last applicable continuance was granted in this case on September 11, 2008.   *See* Pub. L. 110-406, § 13, Oct. 13, 2008, 122 Stat. 4294.   (No. 07-332 at ECF no. 55).   The amended version of the statute would not meaningfully alter Petitioner's claim, however, were it applicable.

[14] The trial court made the appropriate finding as to the interests of justice in each of the continuances it granted.   *See* 18 U.S.C. §3161(h)(8)(A).

September 16, 2007.[15]   (07-332 at ECF No. 24).   Two days then passed until the trial court entered a jointly requested continuance on September 18, 2007, excluding the period from September 19 through October 19, 2007.   (07-332 at ECF No. 25).   The first superseding indictment was filed on October 19, 2007, after which the trial court granted another jointly requested continuance on November 1, 2007, excluding the period between November 1 and December 1, 2007.   (07-332 at ECF No. 26, 28).   Thirteen more days had passed prior to the granting of this continuance, bringing the total to thirty four elapsed days.

On November 29, 2007, the trial court signed another continuance requested by Petitioner, excluding the period between December 3, 2007 and January 11, 2008.   (07-332 at ECF No. 28-30).   Two days passed between the end of the previous continuance on December 1 and the start of the December 3 excludable period.   On June 15, 2008, after four days had elapsed from the ending of the prior continuance, the trial judge signed the next continuance requested by Petitioner, excluding the period between January 15 and February 1, 2008.[16]   (07-332 at ECF No. 33).   On January 29, 2008, Petitioner requested another continuance, which the trial court granted, excluding the period between February 1 and 15, 2008.   (07-332 at ECF No. 34).   On March 3, 2008, after seventeen days had passed from the end date of the prior continuance, the trial court

---

[15]  There is some confusion as to the length of this continuance.   The Order says that it is a 90 day continuance, which is usually the maximum amount of time permitted in this District, but lists the date range as 6/18/07 through 9/18/07, a period of 92 days.   This Court will give Petitioner the benefit of the difference for the sake of this prejudice evaluation.

[16]  This order stated that it would exclude the period of January 11, 2008 through February 1, 2008.   As the Parties appear to agree as to the impropriety of a retroactive continuance, *See United States v. Brenna*, 878 F.2d 117, 122 (3d Cir. 1989) (an order continuing a case must be entered before the days to be excluded), the Court counts the excluded time from the date the order was signed.   This opinion treats the other "retroactive" continuances similarly.

entered another continuance, again requested by Petitioner, excluding the period between March 3 and 24, 2008.   (07-332 at ECF No. 35).   On March 28, 2008, after four more days had run, the trial judge signed a further continuance excluding the period between March 28 and April 12, 2008.   (07-332 at ECF No. 38).   Two days ran after the conclusion of this period before Petitioner filed his pretrial motions which began an exclusionary period running from April 14, 2008, to the disposition of those motions on August 14, 2008.   (07-332 at ECF no. 39, 51).   The trial court also entered further continuances during this period excluding by order the period from May 12 through October 15, 2008.   (07-332 at ECF No. 41, 46, 55).   Following these continuances, twelve days ran before Petitioner filed further motions on October 27, 2008, which were not decided until the day trial began on November 6, 2008.   (07-332 at ECF No. 58, 67).   The total number of un-excluded days, assuming that the retroactive portions of the various continuances did not exclude the days prior to the signing of the order, was seventy-five.

Based on the total number of days that passed, Petitioner is correct that more than seventy un-excluded days passed prior to the start of his trial.   What this exercise does not demonstrate, however, is that Petitioner was therefore entitled to a dismissal with prejudice had counsel made a speedy trial motion.   Under the statutory factors, Petitioner was facing very serious charges including multiple counts of advertising child pornography and possession of thousands of images of child pornography, the facts and circumstances suggest that the extra five day lapse (and thus any dismissal that could have resulted) occurred due to a minor ministerial oversight by both the government and Petitioner during the pre-trial litigation and discovery period of a matter the trial court found quite complex involving numerous motions which resulted in a published opinion, and there does not appear to be (and Petitioner has not argued that there would be) any negative impact

33

upon the administration of justice which would have resulted had Petitioner's indictment been dismissed without prejudice.  As such, the statutory factors suggest that the only appropriate response, had a speedy trial motion been made, would have been a dismissal <u>without</u> prejudice. As Petitioner could therefore still have been tried on the second superseding indictment, no *Strickland* prejudice resulted from counsel's failure to make a speedy trial motion, and thus Petitioner has not shown that he suffered from ineffective assistance of counsel.[17]   *Zahir*, 404 F. App'x at 588.   That petitioner does not argue the factors itself is fatal to Petitioner's claim.   *Id.*

To the extent that Petitioner raises a Constitutional speedy trial claim, he has failed to demonstrate that he would have been entitled to relief and thus suffered prejudice.   In determining whether the constitutional right to a speedy trial has been violated, "the court must consider both the defendant's and the prosecution's conduct and consider four factors among others specific to the given case, namely:  (1) the length of the delay; (2) the reason for the delay; (3) whether, when, and how the defendant asserted his right to a speedy trial; and (4) prejudice to the defendant by the delay. *Barker v. Wingo*, 407 U.S. 514, 530 [(1972)]."   *United States v. Tulu*, 535 F. Supp. 2d 492, 503 (D.N.J. 2008).   Here, the length of the delay was relatively short and resulted mostly from requests made by Petitioner or both Petitioner and the Government based on the complexity of the pre-trial litigation in this case, and the record does not show that Petitioner ever clearly

---

[17] To the extent that Petitioner substantively argues that a speedy trial violation occurred, his failure to make a motion to that effect is fatal to any such claim.   *See* 18 U.S.C. § 3162(a)(2) ("Failure . . . to move for dismissal prior to trial . . . shall constitute waiver of the right to dismissal").   Although Petitioner asserts that he raised the issue by a letter in October 2008, the docket for 07-332 contains no such letter, and thus there is no evidence that Petitioner raised the issue prior to trial.   Likewise even if Petitioner is correct (and nothing in the record before this Court so indicates) that he brought the issue to the Third Circuit's attention in June of 2007, that date predates the running of the 70 day period, and that "raising" would have been premature.

asserted his rights, especially in light of all the continuances requested by Petitioner.   As to prejudice, there appears to be none.   The delay in this case aided, rather than hindered, Petitioner's ability to examine the extensive discovery in this case and Petitioner has not shown how he was harmed or otherwise prejudiced by any delay in his prosecution. As such, a constitutional speedy trial motion would have failed, and Petitioner suffered no prejudice by counsel's failure to make such a motion.   As such, Petitioner has failed to demonstrate that he suffered ineffective assistance of counsel based on counsel's failure to make a speedy trial motion.

**c.   Petitioner's claim that counsel was ineffective in negotiating a plea**

Petitioner also claims that counsel was deficient in failing to negotiate a plea deal in which Petitioner would plead to a single count of possession of child pornography.   Petitioner alleges that counsel told him of an offer from the Government which would require Petitioner to plead to "knowing possession, receipt and distribution" of child pornography.   (ECF No. 1 at PageID 134). Petitioner then alleges that he refused this deal and insisted that he would plead only to a single charge of possession of child pornography, which counsel told him was not possible.   (*Id.*). Petitioner now claims that counsel's statement was "false" and that counsel was therefore ineffective in failing to negotiate for a plea deal including only a single possession charge.

Criminal defendants have "no right to be offered a plea . . . nor a federal right that the judge accept it."   *Lafler v. Cooper*, --- U.S. ---, ---, 132 S. Ct. 1376, 1388 (2012).   To show prejudice in this context, Petitioner would have to show that there was a plea offer, which lapsed or was rejected because of counsel's performance, and that there is a reasonable probability that Petitioner would have accepted absent counsel's behavior.   *Missouri v. Frye*, --- U.S. ---, ---, 132 S. Ct. 1399, 1409 (2012).   Petitioner's allegations fail to establish any of those facets, and therefore he

35

does not establish that he was prejudiced by counsel's actions during plea negotiations.

Petitioner himself states that he was not offered a plea deal including only a single possession charge.   The only deal offered, according to Petitioner, was for possession, receipt, and distribution.   Petitioner as much as states that he would not have taken that offer regardless of counsel's advice.   The record is devoid of any evidence that any other offer was made, or that the Government would have in any way entertained a single possession deal given the significant quantity of evidence the Government possessed showing not only possession but also advertisement of child pornography.   Hence Petitioner's bald assertion that counsel was wrong and could have negotiated such a deal is patently insufficient to establish *Strickland* prejudice. The supposition that such a deal could have been negotiated is not only unsupported by the record, but is absurd in light of the significant evidence the Government possessed and ultimately used to convict Petitioner.   Petitioner has failed to establish *Strickland* prejudice, and as such this claim, too, fails.

> **d. Petitioner's claim that counsel was ineffective for failing to challenge the authenticity of the Government's evidence**

Petitioner next argues that counsel was ineffective for failing to challenge the authenticity of the NAMGLA hard drive and certain images of the NAMGLA website taken by the FBI ten days prior to trial.   As to prejudice, Petitioner argues that, had counsel objected prior to, rather than at, trial, the "hard drive and numerous after the fact screen shots, copy and pastes, e-mails, and text messages" would not have been admitted, and that he would therefore have not been convicted of the first seven counts of the second superseding indictment.   (ECF No. 1 at 139). Petitioner does not indicate which pieces of evidence would have specifically been affected by these objections, nor which would have been excluded.   Petitioner also fails to identify how these

pieces of evidence were inauthentic or otherwise inadmissible.   Petitioner has thus provided

nothing more than unsupported allegations and conclusions that the evidence would have been

excluded, and has thus not shown that but for counsel's performance, the result of his trial would

have been any different.[18]   *Palmer*, 592 F.3d at 395.   In light of the substantial evidence arrayed

against Petitioner, and the trial court's rulings as to the admissibility of that evidence, as well as

the statement in Petitioner's appellate brief recognizing the significant quantity of admissible,

reliable evidence presented, Petitioner has thus failed to show that he suffered any prejudice by

the admission of this evidence.

   **e.   Petitioner's claim that counsel was ineffective for failing to challenge the jury
          verdict for failure to find the appropriate scienter and for failing to make a Rule
          33 motion**

   Petitioner also argues that counsel was ineffective for failing to move for a judgment of

cquittal as the jury had not found the appropriate scienter and for failing to make a Rule 33 motion

for a new trial.   As to the first argument, Petitioner in essence argues his disagreement with the

verdict reached by the jury.   As summarized above, the court extensively charged the jury as to

the scienter requirements involved in this case, specifically that Petitioner acted "knowingly," or,

in the case of the attempt theory charged to the jury, with the intent to advertise or receive child

pornography.   "A jury is presumed to follow its instructions."   *United States v. Dollson*, --- F.

---

[18]  This Court also notes that the trial court heard and denied several motions on the basis of
authenticity and denied those motions on the record.   (*See, e.g.,* 07-332 at ECF No. 88 at 93:8-
94:1).   Those denials, save for the denial as to the NAMGLA hard drive, were not on the basis
of timeliness, but rather on the merits.   (*Id.*; 07-332 at ECF 95 at 16-18).   Thus, Petitioner's
argument that the motions dealing with evidence other than the NAMGLA hard drive were
denied simply as untimely is specious at best.   It is not clear from the record the extent to which
the NAMGLA hard drive objection was overruled on timeliness as opposed to on the merits.

App'x ---, ---, 2015 WL 1787269, at *4 (3d Cir. 2015); *see also Richardson v. Marsh*, 481 U.S. 200, 211 (1987).   Given the extensive charge as to scienter given by the trial court, and the overwhelming evidence provided to the jury which clearly established that Petitioner acted knowingly and, indeed, intentionally, there is no reason to doubt that the jury followed the instructions given in this case.   As such, any claim raised by counsel challenging the verdict on that basis would have been denied and Petitioner therefore suffered no *Strickland* prejudice as a result of counsel's failure to raise such a claim.

Petitioner also argues that counsel was ineffective for failing to make a motion for a new trial.   Even where the trial court believes that a jury verdict is "contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.'"   *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).   Motions for a new trial under Rule 33 are not favored and should be "granted sparingly and only in exceptional cases.   *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).   Given the overwhelming evidence brought to bear against Petitioner, it is clear that no miscarriage of justice occurred in this case:   Petitioner is not innocent of the crimes for which he was convicted.   As such, any Rule 33 motion for a new trial would have been denied, and Petitioner suffered no prejudice as a result of counsel's failure to raise such a motion.   Because Petitioner has failed to show that he suffered prejudice in this or any other of his ineffective assistance of counsel claims, and therefore fails to establish the prejudice prong of the *Strickland* test, this Court need not address Petitioner's allegations that counsel was deficient.

**5.   Petitioner's remaining claims are barred due to procedural default**[19]

Petitioner raises numerous additional claims, all of which he failed to raise either in the
trial court or on direct appeal.[20]   "Habeas review is an extraordinary remedy and 'will not be
allowed to do service for an appeal.'"   *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting
*Reed v. Farley*, 512 U.S. 339, 354 (1994); *Sunal v. Large*, 332 U.S. 174, 178 (1947)).   With the
exception of ineffective assistance of counsel claims which normally require information outside
the appellate record, petitioners are generally not permitted to raise claims in a § 2255 motion
which have been procedurally defaulted, as they were not previously been raised on direct appeal
or in the trial court, unless petitioner can either show cause and prejudice or actual innocence.[21]
*See Massaro v. United States*, 538 U.S. 500, 504 (2003); *United States v. Frady*, 456 U.S. 152,
167-68 (1982); *see also Parkin v. United States*, 565 F. App'x 149, 151-52 (3d Cir. 2014).   As
Petitioner does not attempt to, and likely could not, show actual innocence, these claims would be

---

[19]  Petitioner's defaulted claims include, in whole or in part, grounds 2, 4, 5, 8-28, 30-54, 56-66,
68-78, 80-87, 110, and 112.   For the purposes of clarity, this Court also notes that Petitioner did
not have a ground 3, 106, or 108.

[20]  Petitioner claims that he raised many of his claims in his "rebuttle" motions in the trial court
following the denial of Petitioner's motion for a judgment of acquittal after the guilty verdict at
trial.   (07-332 at ECF No. 107, 109).   These motions however, were actually requests by
Petitioner for the trial judge to "read into the record" factual and legal arguments which
Petitioner had not raised which responded to motions which the trial court had already decided,
including both pre-trial evidentiary motions and the motion for judgment of acquittal.   (07-332
at ECF No. 107, 109).   The motions were essentially attempts by Petitioner to inject into the
record arguments that had not been properly and timely raised, and were denied by the trial
court.   (07-332 at ECF No. 125).   These claims were never part of the trial court record,
Petitioner's after the fact attempt to inject them notwithstanding.   In any event, those claims
were never raised on appeal, and are thus defaulted on that basis regardless.   *See Travilion*, 759
F.3d at 288; *DeRewal*, 10 F.3d at 105 n. 4.

[21]  Among the claims subject to this procedural default bar are both claims raised in neither the
trial nor appellate courts and those claims which Petitioner should have, but did not, raise on
direct appeal.   *See Travilion*, 759 F.3d at 288; *DeRewal*, 10 F.3d at 105 n. 4.

cognizable only if he were able to show cause and actual prejudice.

To show cause, Petitioner must demonstrate that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim." *Parkin*, 565 F. App'x at 151 (quoting *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005)). "Examples of external impediments which have been found to constitute cause in the procedural default context include interference by officials, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and ineffective assistance of counsel." *Pelullo*, 399 F.3d at 223. Where procedural default is caused by counsel's tactical decisions, ignorance of law or facts, or inadvertent failure that fails to establish constitutional ineffectiveness, however, the petitioner cannot show cause for his default and that default is binding on his § 2255 motion. *Stradford v. United States*, No. 11-4522, 2013 WL 5972177, at *3 (D.N.J. Nov. 8, 2013); *see also Murray v. Carrier*, 477 U.S. 485-87 (1986); *Engle v. Isaac*, 456 U.S. 107, 134 (1982). Thus, in order to establish cause through counsel's action or inaction, the petitioner must substantially show that counsel was constitutionally ineffective under *Strickland*. *Stradford*, 2013 WL 5972177, at *4; *see also Trevino v. Thaler*, --- U.S. ---, ---, 133 S. Ct. 1911, 1917 (2013); *Martinez v. Ryan*, --- U.S. ---, ---, 132 S. Ct. 1309, 1316-1317 (2012); *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991) (the petitioner bears the risk of negligence by his lawyer which is not constitutionally ineffective). Even if a petitioner establishes cause, he must then show that he suffered actual prejudice, *i.e.* that the alleged errors "worked to his actual and substantial disadvantage infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.

Here, Petitioner has not shown cause and actual prejudice. Petitioner asserts that he attempted to bring issues up with his attorneys who told him the arguments he raised "don't apply"

40

to Petitioner's case, and that counsel therefore refused to raise them.   (ECF No. 28 at 4). Petitioner asserts that he was then told that if he didn't like counsel's arguments, he could raise his own *pro se* in addition, which he did.   (*Id.*).   As with Petitioner's previous claims of ineffective assistance discussed above, Petitioner's conclusory allegations show neither that counsel was deficient nor that prejudice was suffered as a result.   Indeed, based on the argument that Petitioner makes, it appears that counsel's rejection of his arguments was a strategic choice by counsel to raise only those issues which had serious merit and thus Petitioner does not show ineffective assistance.  *See United States v. Aldea*, 450 F. App'x 151, 152 (3d Cir. 2011) ("[c]ounsel cannot be ineffective for failing to raise meritless claims"); *United States v. Berry*, 314 F. App'x 486, 489 (3d Cir. 2008); *Wets v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000); *Parrish v. Fulcomer*, 150 F.3d 326, 328-29 (3d Cir. 1998).   Petitioner's claim of cause is further undermined in so much as he was provided an opportunity to be heard on any additional claims he wished to raise, and did not raise any of these new claims in his own *pro se* briefs to the trial court.

The only other argument Petitioner presents as to his failure to raise any of these issues on direct appeal is that Petitioner wished to raise them, but appellate counsel refused.   Such an argument fails, however in so much as

> it is a well established principle that counsel decides which issues to pursue on appeal, see *Jones* [*v. Barnes*, 463 U.S. 745, 751-52 (1983)], and there is no duty to raise every possible claim. *See id.* at 751.   An exercise of professional judgment is required. Appealing losing issues "runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions."  *Id.* at 753. Indeed, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751).

*Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996); *see also Aldea*, 450 F. App'x at 152.   As the Supreme Court has reiterated, showing that counsel was incompetent on appeal is difficult as "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."   *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Petitioner's appellate counsel raised several issues out of the many that potentially could have been raised, and the Third Circuit found the issues raised of sufficient import to merit discussion in a published decision.   Petitioner has not shown that any of the issues he raises here are stronger than those raised on direct appeal, and as such has not rebutted the presumption that appellate counsel was effective.   *Id.*   In any event, Petitioner makes no attempt to show what prejudice, if any, he suffered through appellate counsel's alleged failings.   As Petitioner has therefore not shown that counsel was constitutionally ineffective for failing to raise the issues he now wishes to argue and does not even attempt to show that he suffered prejudice from counsel's strategic decisions as to which issues to raise on appeal, Petitioner cannot establish cause and actual prejudice through this argument.

As Petitioner has not shown, through any of his arguments, that he was provided ineffective assistance by counsel, and has shown no other factor "external to the defense" which would merit consideration of his defaulted claims, and as Petitioner has not provided any argument as to prejudice, his procedurally defaulted claims are barred here.   *Parkin*, 565 F. App'x at 151; *Pelullo*, 399 F.3d at 223-24.

## III.   CERTIFICATE OF APPEALABILITY

42

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a proceeding under § 2255 unless he has "made a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).   As Petitioner's claims are either barred or without merit, he has failed to make a substantial showing that he was denied a constitutional right. Because Petitioner has failed to make such a showing, no certificate of appealability shall issue.

## IV. CONCLUSION

For the reasons stated above, petitioner's motion is DENIED, and no certificate of appealability shall issue.   An appropriate order follows.

s/ Jose L. Linares
Hon. Jose L. Linares, U.S.D.J.

43